UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
HAROLD H. MABEE, JR.,                 :

                    Petitioner,       :     <u>REPORT AND RECOMMENDATION</u>

        - against -                   :     05 Civ. 4282 (SCR) (MDF)

WILLIAM PHILLIPS, Superintendent,     :
Green Haven Correctional Facility,
                                      :
                    Respondent.
----------------------------------X

TO:  THE HONORABLE STEPHEN C. ROBINSON, U.S.D.J.


     Petitioner, <u>pro</u> <u>se</u>, seeks a writ of habeas corpus pursuant

to 28 U.S.C. §2254 to challenge his convictions for murder in the

second degree (N.Y. Penal Law §125.25 subd. 2 (depraved

indifference to human life)), manslaughter in the second degree

(N.Y. Penal Law §125.15), criminal possession of a weapon in the

third degree (N.Y. Penal Law §265.02) and reckless endangerment

in the first degree (N.Y. Penal Law §120.25).  The Orange County

Court, Judge Berry, sentenced him to concurrent terms of

imprisonment the longest of which is twenty (20) years to life.

The Appellate Division, Second Department, vacated the conviction

and sentence for manslaughter in the second degree and as

modified affirmed the judgment.  <u>People v. Mabee</u>, 300 A.D.2d 509,

750 N.Y.S.2d 893 (2d Dep't 2002), <u>lv</u>. <u>denied</u>, 99 N.Y.2d 656, 760

N.Y.S.2d 120 (2003).

     Thereafter, Petitioner filed two (2) applications to set

aside the conviction pursuant to N.Y. Crim. Proc. Law §440.10.

The Orange County Court denied the first application in a

decision dated February 25, 2004.  Resp. Exh. Vol. II at 329-330.

The Appellate Division, Second Department, Justice Prudenti, denied Petitioner's application for leave to appeal this decision on May 20, 2004. Id. at 353 (Exh. 30).

Thereafter, Petitioner filed an application for writ of error coram nobis to raise a claim of ineffective assistance of appellate counsel. The Appellate Division, Second Department denied this application. People v. Mabee, 12 A.D.3d 381, 783 N.Y.S.2d 300 (2d Dep't 2004), lv. denied, 4 N.Y.3d 800, 795 N.Y.S.2d 176 (2005).

In statements to the police, Petitioner admitted the homicide. Additional direct and circumstantial evidence supports the conclusion that he attempted to cover it up first.

Police in Port Jervis interviewed individuals concerning the disappearance of Jennifer Santiago. Detective Worden interviewed Petitioner in front of his residence on Seward Avenue on the afternoon of December 27, 1999. Petitioner had been with Santiago on the evening of December 25, 1999 into the early morning hours of December 26, 1999. When he and a friend, Ed Murphy, arrived at Legends Bar, Santiago was already drinking. They talked about Santiago's ex-boyfriend and then went to the Newbauer Bar where the bartender asked them to leave. They returned to Legends and resumed drinking. Murphy went home first. Later, Petitioner and Santiago went to Murphy's house to obtain food, which they ate in the basement. Santiago said that she had to go home, so Petitioner and she walked together to Pike and Main Streets where they parted company. Petitioner believed

that Santiago had walked home.

During the course of the interview, Petitioner also told the detective that he had been at Rhonda Talmadge's house at 4:45 a.m. Talmadge had an order of protection against Petitioner. The next day, December 28, 1999, Worden, accompanied by Detective Myers, arrested Petitioner at his residence for violating the order of protection. The detectives took Petitioner to City Hall where <u>Miranda</u> warnings were given and a written waiver was signed by Petitioner and Worden. This time, Petitioner expanded the story. He and Murphy went to Legends Bar. Petitioner met Santiago, and they drank pitchers of beer while they talked. They next went to Newbauer's, where Petitioner was not allowed, and next to Ma and Pa's, again where Petitioner was not allowed, so they returned to Legends. Murphy left first. Petitioner and Santiago left the bar and went to a Dairy Mart because Petitioner was hungry. Because the Dairy Mart was closed, they went to Murphy's house where they ate food in the basement and stayed for approximately 30-45 minutes. They left Murphy's house and parted company at Pike and Main Streets with Petitioner returning to Talmadge's house on Pike Street. Petitioner had not had sex with Santiago and thought that she was intoxicated.

When the police confronted Petitioner with the fact that he was not seen on a videotape from a surveillance camera located on Pike Street, Petitioner expanded his statement. Because he did not have a key to Talmadge's house, he had to walk to his mother's house to call Talmadge. Enroute he vomited all over his

pants.  He then went from his mother's to Talmadge's house, where
he washed his pants and went to sleep until awakening at about
noon.  He returned to his mother's house where he remained for
the afternoon and then went to Tara Sullivan's house where he had
sex with her and eventually at 9:30 p.m. took a cab to Talmadge's
house.

Sergeant Van Inwegen, who was on the desk and was aware of
the ongoing investigation concerning Santiago's disappearance,
testified that when he gave Petitioner some cookies and coffee,
Petitioner asked if the other detectives had found Santiago.  He
said they had not and expressed confidence that they would.
Petitioner then asked if he was going to be charged with murder,
and Van Inwegen said that there were other charges besides murder
and discussed Santiago's family.  After Van Inwegen returned to
his desk, Petitioner asked him to return and inquired whether
criminally negligent homicide was a felony.  Van Inwegen replied
that it was and reported his interaction with Petitioner to the
investigating detectives.

In light of what Van Inwegen told them and what they knew
from their ongoing investigation, Worden and Myers advised
Petitioner that they did not think that he was being truthful
with them and that they believed that he was responsible for
Santiago's disappearance.  Worden again administered Miranda
warnings and Petitioner indicated his willingness to talk to the
police without an attorney.  When he and Santiago went to
Murphy's house from Legends Bar, they were both intoxicated.  He

4

had sex with Santiago in the basement.  During the intercourse, he choked her with his hands, a technique which he had learned from pornographic movies.  Santiago lost and regained consciousness more than once.  They then went to the basement of Petitioner's mother's house where the intercourse with choking resumed, during which Santiago again lost and regained consciousness.  Petitioner next changed positions to anal intercourse, doggie style, whereupon he wrapped a cord around her neck and choked her with it.  The sex act with the cord lasted for about fifteen (15) minutes during which time Santiago passed out and regained consciousness.  In his reenactment of the event for the police, Petitioner indicated how he had pulled the cord around her neck while clenching his fist and gritting his teeth, a demonstration which Detective Myers recreated for the jury.  When Petitioner released the cord, Santiago fell to the side.  His attempts to awaken her verbally failed as did CPR.  Petitioner, now nervous, decided to dress Santiago and broke into his grandfather's pick-up truck in order to transport the body to a location off Route 6 where he dumped it and covered it with leaves.  He then returned to his mother's house.  Petitioner did not know if Santiago had engaged in this type of sexual activity, but he had done so with his girlfriends.  In response to Detective Worden, Petitioner also acknowledged that he knew that he could kill someone by choking.

A written statement in Q and A format followed in which Petitioner again refined his testimony.  Murphy left the bar at 2

or 3 a.m.  When Petitioner and Santiago got to Murphy's house,
Petitioner attempted to awaken Murphy, who went back to sleep.
They ate food and fooled around in the basement.  Santiago had a
bump on her head from having fallen down the stairs.  Although
they started to have sex, they did not finish.  During their
activity, Petitioner choked Santiago a little with his hands
because it turned him on to do this.  Santiago passed in and out
of consciousness repeatedly.

They then went to the basement of his mother's house where
they had sex, during which Petitioner choked her with his hand
while on top of her.  The couple then changed to anal sex on the
floor, and Santiago allowed Petitioner to tie a light cord around
her neck.  Petitioner claimed that he had successfully engaged in
this fetish with other girlfriends.  While Petitioner pulled on
the cord from behind, Santiago passed out more than once.  This
activity continued for an hour and a half until Petitioner pulled
on the cord for fifteen (15) minutes straight after which
Santiago fell to the side with her eyes closed and her tongue
hanging out.  When he realized that she was not breathing, he did
not summon the police nor an ambulance because he thought he
would get into trouble.  He then reiterated the events concerning
the transportation and dumping of the body, following which he
called Talmadge to ask her to unlock the door for him.  While
walking to Talmadge's house, he vomited all over himself.  After
he arrived at Talmadge's, he washed his clothes and in the
afternoon returned to his mother's house where he fell asleep.

He expressed remorse and characterized the incident as an accident which he wished had never happened.

Petitioner then led the police to the area where he had left the body. During the trip, when Myers mentioned that he was going to get a search warrant for the house, Petitioner identified the cord he had used as the one attached to a picture frame. Pursuant to the warrant, the police recovered from the Seward Avenue premises a picture frame with an electrical cord. The medical examiner later confirmed that marks on the body were consistent with the cord and that Santiago had died of asphyxiation from ligature strangulation. The police also photographed the scene, including Petitioner's hand, which had become swollen from being used to break into the pick-up truck, the broken rear window of the pick-up truck through which Petitioner had gained entry and the bed of the pick-up truck where the body had been placed while being transported.

In addition to Petitioner's statements as related by the police and scientific and forensic evidence, including testimony about the gathering of the evidence, the jury heard from the witnesses who were personally familiar with Petitioner's sexual practices/predilections.

In November 1999 Rhonda Talmadge engaged in a sexual relationship with Petitioner. On one occasion, Petitioner had grabbed her throat with his right hand until she passed out. On two other occasions, while having sex with Petitioner, who was choking her, she did not pass out. She told Petitioner that she

did not like being choked and did not want him to do it.

On December 21 or 22, 1999, mere days before the homicide, Petitioner visited Tara Sullivan, a friend who became a sex partner. Petitioner appeared to be drunk and upset and told Sullivan that he could make her pass out and that he liked that kind of thing. She declined but Petitioner put his hands around her throat and in response she got Petitioner off of her and advised that she did not want to do that. Petitioner seemingly acquiesced, resumed sex and then put his hands on her throat until she passed out. When she regained consciousness, Petitioner apologized and again excused his behavior by stating that it turned him on to do this. Nevertheless, Sullivan admitted that she had attempted to have sex with Petitioner on December 26, 1999 at about 8 p.m.

The above testimony of Talmadge and Sullivan was undoubtedly intended to provide the jury with a more accurate understanding of the response Petitioner had received to his preferred fetish and thereby contradict his own repeated selfserving declarations as contained in his statements to the police. This testimony also circumstantially contradicted the defense witnesses, Tara Sweepman and Jessica Wormuth.

Sweepman, who was serving time for having sold heroin to an undercover officer, had a sexual relationship with Petitioner for nine years. On twelve occasions during sex Petitioner had choked her; four of the occasions with a bathrobe tie. The act was not forced and the event had been pleasurable and had intensified her

orgasm.  Wormuth, who also had a police record, had a sexual relationship with Petitioner during a seven year period. Petitioner, who had been both sober and drinking prior to sex, had choked her only with his hands and the activity had intensified her orgasm.

Given the convictions, the testimony from Sweepman and Wormuth was probably not persuasive.  The testimony from witnesses who had observed the principals on that fateful night was very persuasive, however.  It circumstantially solidifies the conclusion that Petitioner unsuccessfully attempted to lie to the police.  It also leaves the impression that what actually happened that night is closer to an amalgamation of all of Petitioner's statements to the police.

Alan Banuat, Santiago's former boyfriend and the father of her two children, had been living with Santiago's parents.  On Christmas Day, Santiago joined the family for dinner.  She was wearing green pants and an off-white sweater.  At about 9 p.m. that evening Santiago's father drove the couple to her house. She left there at about 11 p.m. dressed in green pants, an off-white sweater and a green winter jacket.  She said that she was going to the bar, Legends, and might not return until 6 a.m. This evidence explained how the victim had come to be at the location where she met Petitioner and confirmed that the body, found with green clothing at the location where Petitioner had indicated, had been Jennifer Santiago.

On Christmas night, Petitioner, Ed Murphy, Rhonda Talmadge

9

and Dawn Smith, Murphy's girlfriend, were having drinks at the
Newbauer bar. Smith left first. Talmadge left at about 11:30
p.m. Petitioner and Murphy stayed there for about an hour to and
hour and a half before they went to Legends.

According to the bartender at Legends, Santiago was already
there when Petitioner and Murphy arrived. She appeared to be
either depressed or intoxicated because she had her head down on
the bar. On the night of December 25th over to the early hours
of December 26th Petitioner and Santiago entered Legends four
times. Each time they had a pitcher of beer. Murphy accompanied
them on the first two occasions. He confirmed that Santiago told
Petitioner that she would buy him beer if he stayed. He went
home to sleep because he was intoxicated. The bartender placed
the couple's last departure at 2 or 2:30 a.m. on 12/26. Santiago
did not appear to be intoxicated, and Petitioner appeared to be
mildly intoxicated.

Dawn Smith testified that she woke up and saw someone with
dark hair sitting on her couch while Petitioner attempted to
waken Murphy. Santiago had dark hair. She heard Petitioner say
that he was going to get something to eat.

When Murphy awoke on 12/26 he found Petitioner standing in
the diningroom. Petitioner told him that he had brought this
bitch to the basement, and Murphy responded that Petitioner and
the woman had to leave before Dawn woke up. Murphy went to the
basement where he found Santiago in poor condition and slumped
over the couch sideways with her head down. She mumbled

something.  Although Petitioner said that Santiago had fallen down the stairs, Murphy did not observe any injuries or blood. After he observed Petitioner help Santiago up the stairs and out the backdoor, Murphy returned to bed.

Rhonda Talmadge awoke at 6 a.m. on 12/26 to discover Petitioner in her bed.  When she awoke again at 10:30 a.m., Petitioner was no longer there.  Inside her washer, she discovered that Petitioner's jeans and shirt had been washed along with girls' socks.  When Rhonda called Petitioner later that day and asked about the clothes, Petitioner said that the socks were his mother's and that he had puked all over his clothes.

The instant Petition raises seven (7) grounds for review: (1) The evidence is insufficient to establish Petitioner's guilt beyond a reasonable doubt and the jury's verdict is contrary to the weight of the evidence; (2) The state trial court's refusal to submit murder in the second degree and manslaughter in the second degree as alternative counts violated Petitioner's right to a fair trial; (3) Three claims of ineffective assistance of trial counsel:  (a) trial counsel failed to alert the state trial court to the statutory requirement to submit the homicide counts in the alternative; (b) trial counsel failed to exercise a challenge to a juror who disclosed that she was related to a victim of rape; and (c) the state trial court erred in denying Petitioner's application to relieve his trial attorney and appoint a new attorney to represent him; (4) Petitioner was

deprived of the effective assistance of appellate counsel; (5)
The statutory distinction between reckless manslaughter and
depraved indifference murder is unconstitutionally vague as
applied to Petitioner; (6) The Appellate Division's determination
was an unreasonable application of clearly established law as
determined by the United States Supreme Court; and (7) Newly
discovered evidence, which the courts have unconstitutionally
failed to consider, tends to exonerate Petitioner of murder in
the second degree.

At the outset, the State has asserted the same procedural
default defense to Grounds One, Three and Five. The papers in
support of Petitioner's application for leave to appeal to the
New York Court of Appeals have been submitted collectively as
Resp. Exh. 15. The letter brief submitted in support of the
application discusses only Ground Two at length. It contains no
argument addressed to the other issues that had been raised at
the Appellate Division and concludes with: "A copy of the
Appellate Division Decision and Order with the January 7, 2003
Notice of Entry and appellant's and respondent's appellate briefs
are enclosed herewith." Resp. Exh. Vol. I at 171.

The case law from the Court of Appeals for the Second
Circuit now definitively establishes that Petitioner's letter
application for leave to appeal to the New York Court of Appeals
presented only Ground Two and no others. See, e.g., Smith v.
Duncan, 411 F.3d 340, 345 (2d Cir. 2005); Jordan v. Lefevre, 206
F.3d 196, 198-199 (2d Cir. 2000) ("...arguing one claim in his

letter while attaching an appellate brief without explicitly alerting the state court to each claim raised does not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction."); Campos v. Portuondo, 193 F. Supp.2d 735, 744-745 (S.D.N.Y. 2002), aff'd 320 F.3d 185 (2d Cir.) (per curiam), cert. denied, 540 U.S. 958 (2003). Accordingly, as Petitioner can no longer present Grounds One, Three and Five to New York's highest court, pursuant to the rule in O'Sullivan v. Boerckel, 526 U.S. 838, 848, 119 S.Ct. 1728, 1734 (1999), these claims have been procedurally defaulted. See, e.g., St. Helen v. Senkowski, 374 F.3d 181 (2d Cir. 2004) (per curiam). To obtain review of a procedurally defaulted claim, Petitioner must demonstrate cause for the default and actual prejudice resulting therefrom, as those concepts have been defined in decisions of the United States Supreme Court, or that he is actually innocent. See Schlup v. Delo, 513 U.S. 298, 314-315, 115 S.Ct. 851, 860-861 (1995) (cases cited and discussion therein). As the discussion below demonstrates, preserved or procedurally defaulted, the claims do not entitle Petitioner to federal habeas relief.

Ground One (Appellate Division Brief Point I)

In considering a challenge to the sufficiency of the evidence of a state criminal conviction, a federal habeas court looks to state law to determine the elements of the crime and reviews the evidence in the light most favorable to the State. The petitioner is entitled to relief only if no rational trier of

fact could find proof of guilt beyond a reasonable doubt based upon the evidence presented at trial.  Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002).

> Under New York law,....[a] defendant may be found guilty of depraved-indifference murder where, "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."  [N.Y. Penal Law] §125.25(2).
>
> > A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists.  The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation....
>
> [N.Y. Penal Law] §15.05(3).  It is thus an element of depraved-indifference murder that the defendant was indifferent to whether his or her acts would result in the victim's death.

Policano v. Herbert, 430 F.3d 82, 87 (2d Cir. 2005) (emphasis supplied).

Relevant to the instant case, in the recent decision of People v. Suarez, 6 N.Y.3d 202, 811 N.Y.S.2d 267 (2005) (per curiam), the New York Court of Appeals explained the element which distinguishes depraved indifference murder (N.Y. Penal Law §125.25 subd. 2) from other homicides as follows:

> Since the enactment of the revised Penal Law, however, we have recognized that in rare circumstances, depraved indifference murder can also be found in certain unintentional killings involving only a single individual. These limited cases are those in which--although the intent to kill is absent--the defendant's utter depravity in causing the victim's death warrants punishment in excess of that available for manslaughter.  Such cases will arise only when the acts of the defendant are "marked by uncommon brutality--coupled not with an intent to kill ... but with

14

depraved indifference to the victim's plight" (<u>Payne</u>, 3 N.Y.3d at 271, 786 N.Y.S.2d 116, 819 N.E.2d 634).  To constitute depraved indifference the defendant's

> "conduct must be '"so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another"'" (<u>People v. Russell</u>, 91 N.Y.2d 280, 287-288, 670 N.Y.S.2d 166, 693 N.E.2d 193 [1998], quoting <u>People v. Fenner</u>, 61 N.Y.2d 971, 973, 475 N.Y.S.2d 276, 463 N.E.2d 617 [1984]).

The vast majority of killings simply do not meet this standard.  They are suitably punished by statutes defining intentional murder or manslaughter in the first or second degree or criminally negligent homicide.

<u>Id</u>. at 210-211, 811 N.Y.S.2d at 274.

Petitioner essentially maintains that his case was one of those vast "majority of killings."  He cites his lack of intent to hurt the victim, the consensual nature of the sexual conduct, including the asphyxia, and his prior successful experience with other women.  He overlooks, however, the evidence of prior experiences with women who had declined to participate in asphyxia, that he nevertheless choked one of them even though she had told him not to choke her and the considerable evidence from witnesses, including his own statement, that the victim was either intoxicated or in a weakened condition from alcoholic beverage in combination with a fall.  The degree of intoxication reasonably inferable from that testimony suggests that consent concerning the risks associated with asphyxia may well have been at issue because her faculties were sufficiently impaired that she was not able to protest his repeated chokings.  Indeed, by the time the activity had escalated to the use of an electrical

15

cord, fists clenched and teeth gritted, permits the inference
that an objection or protestation would not have dissuaded him.
At best, Petitioner got carried away with himself and
demonstrated a complete and utter disregard for the very
substantial risk of death involved in employing asphyxia to
enhance the sexual experience in this case.  The jury, however,
was not required to infer a best case scenario where Petitioner,
instead of summoning help immediately when the victim fell to the
side, sought to conceal the crime and thereafter was less than
candid with the police about what he characterized as an
accident.  See Elliott v. Conway, 424 F. Supp.2d 604, 612
(W.D.N.Y. 2006).

In Suarez the New York Court of Appeals found from a review
of its precedents that there are three (3) categories of cases in
which convictions for depraved indifference murder have been
upheld in one on one confrontations:  (1) the accused abandoned
the victim in circumstances where the victim was highly likely to
die and with utter callousness toward the victim's mortal plight;
(2) the accused engaged in brutal and/or prolonged torture of a
particularly vulnerable victim; and, relevant to this case, (3)

> We have also upheld convictions for depraved indifference
> murder in a few other extraordinary cases involving conduct
> that endangered only one person, where the evidence showed
> not just recklessness, but depraved indifference to human
> life (see e.g. People v. Roe, 74 N.Y.2d 20, 544 N.Y.S.2d
> 297, 542 N.E.2d 610 [1989] [defendant fired at point-blank
> range without knowing whether the bullet was a "live" or
> dummy" round]).  Where comparable facts are not shown,
> however, a jury is foreclosed, as a matter of law, from
> considering a depraved indifference murder charge whenever
> death is the result of a one-on-one confrontation.

People v. Suarez, supra, 6 N.Y.3d at 213, 811 N.Y.2d at 275-276.

The facts of Roe are illustrative and comparable:

Defendant, a 15 1/2-year-old high school student, deliberately loaded a mix of "live" and "dummy" shells at random into the magazine of a 12-gauge shotgun. He pumped a shell into the firing chamber not knowing whether it was a "dummy" or a "live" round. He raised the gun to his shoulder and pointed it directly at the victim, Darrin Seifert, who was standing approximately 10 feet away. As he did so, he exclaimed "Let's play Polish roulette" and asked "Who is first?". When he pulled the trigger, the gun discharged sending a "live" round into Darrin's chest. Darrin died as a result of the massive injuries.

People v. Roe, 74 N.Y.2d 20, 22, 544 N.Y.S.2d 297 (1989). The instant record permitted the jury to infer that Petitioner played a form of sexual asphyxia roulette with Jennifer Santiago. He repeatedly choked her even though she had been drinking and might well have been seriously injured from any of the chokings. He then escalated the choking from his hands to an electrical cord, applied with force continuously for fifteen (15) minutes and apparently without any awareness that he had far exceeded the reasonable bounds of consensual sexual activity. The absence of intent cannot alter the direst of consequences arising from, as the jury would easily have inferred, a selfcentered focus on his own potentially lethal sexual desires.

Ground Two (Appellate Division Brief Point II)

Manslaughter in the second degree is a lesser included offense of murder in the second degree, depraved indifference to human life. The latter has three elements: depraved indifference, recklessness and homicide, see People v. Suarez, supra, 6 N.Y.3d at 214, 811 N.Y.S.2d at 276-277, whereas the

17

former only requires proof of recklessness and homicide.  N.Y.
Penal Law §125.15.  Pursuant to N.Y. Crim. Proc. Law §300.40
subd. 3(b), they should have been submitted in the alternative to
the jury under the provisions of N.Y. Crim. Proc. Law §300.50.
Without reference to whether they are submitted in the
alternative, §300.40(3)(b) specifically provides that "[a]
verdict of guilty upon the greatest count submitted is deemed a
dismissal of every lesser count submitted, but not an acquittal
thereon."

The record discloses that after discussion of the issue
Petitioner's counsel failed to object to their submission in the
conjunctive.  Pursuant to §300.50 subd. 1, "[a]ny error
respecting such submission, however, is waived by the defendant
unless he objects thereto before the jury retires to deliberate."
In addition to relying on Petitioner's failure to object the
State conceded that the conviction on the lesser included offense
should be dismissed pursuant to §300.40(3)(b).

The Appellate Division responded by following People v.
Grier, 37 N.Y.2d 847, 848, 378 N.Y.S.2d 37, 38 (1975) (mem.)
where the New York Court of Appeals cited and followed
S300.40(3)(b) and in response to the prosecutor's concession
vacated a conviction of grand larceny in the third degree as a
lesser included offense of robbery.  Petitioner maintains that
neither Grier nor the statute prescribes dismissal of the lesser
included offense as the remedy where the trial court fails to
follow the admonition to submit the counts in the alternative.

18

Petitioner also asserts that he suffered prejudice, apparently
stemming solely from his inability to speculate about what
reception the jury would have given to the counts if they had
been presented in the alternative.  He fails, however, to
identify any specific prejudice, fails to explain why he should
be given a new trial when he is guilty of depraved indifference
murder, and perhaps, most importantly, fails to explain how this
issue implicates any right guaranteed by the United States
Constitution.  That last omission alone makes this a ground which
fails to state a claim that entitles Petitioner to federal habeas
relief.

Statutes must be read together as they apply to the facts
and circumstances of individual cases.  In this case under
§300.50 the effect of trial counsel's failure to object waived
any error in the submission of the counts in the alternative.  It
did not, however, waive the public policy of §300.40(b)(3), an
affirmative direction by the Legislature to the courts to dismiss
a conviction for a lesser included offense when the defendant has
been convicted of the greater offense.  In sum, Petitioner's
claim has no merit because the Appellate Division followed the
law of New York.

<u>Ground Three</u> (Appellate Division Brief Point III)

To obtain relief on the basis of ineffective assistance of
counsel, Petitioner must demonstrate that counsel's performance
fell below professional norms, <u>i.e.</u>, that it was outside the wide
range of professionally competent assistance, and that there is a

reasonable probability that the outcome of the proceeding(s) would have been different in the absence of counsel's deficiency or error. Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006).

With respect to Ground 3(a), Petitioner has failed to demonstrate that he was prejudiced. The record amply establishes his guilt of murder based on depraved indifference to human life. Counsel's failure to alert the state trial court to the statutory requirement that the homicide charges be submitted in the alternative, assuming that it was ineffective assistance, was inconsequential. Petitioner has offered nothing to substantiate his essentially unstated hypothesis that the jury would have found him guilty of manslaughter, the lesser included offense, if it had been required to choose.

Petitioner's complaint that counsel should have excused a potential juror who knew a victim of rape, Ground 3(b), has no merit. This case was not about rape. Petitioner has not demonstrated that the juror was excusable for cause with respect to the charges against him, and whether an attorney exercises a peremptory challenge to remove a prospective juror is a matter of tactics and strategy. See People v. Colon, 90 N.Y.2d 824, 826, 660 N.Y.S.2d 377, 378 (1997) (mem.).

With respect to Ground 3(c), as part of a motion to set aside the verdict pursuant to N.Y. Crim. Proc. Law §330.30 subd. 1, counsel requested that the state trial court relieve the Legal Aid Society of Orange County and appoint him a new attorney premised on four (4) specified instances of ineffective

assistance of trial counsel.  The state trial court denied the
motion in a brief written decision.  Resp. Exh. 8.  Each of the
four instances arises from the trial record and therefore was
available for direct appeal.  In fact, one of them was raised on
direct appeal.  David Lindine, Esq. represented Petitioner at
trial.  Lisa H. Blitman, Esq. represented Petitioner on direct
appeal.  Under these circumstances, the Court fails to understand
how Petitioner could have been prejudiced from the state trial
court's ruling.  He had a different lawyer on appeal who was free
to raise issues to the extent the record and the law merited
their presentation.

<u>Ground Four</u> (Coram nobis application; Resp. Exh. 31)

     To obtain relief for a claim that he was denied the
effective assistance of counsel on appeal, Petitioner must
demonstrate that the issue appellate counsel failed to raise was
sufficiently meritorious that if it had been raised the Appellate
Division would have been required to grant relief.  <u>See</u> <u>Bunkley</u>
<u>v. Meachum</u>, 68 F.3d 1518, 1521 (2d Cir. 1995) (cases cited
therein); <u>Johnson v. Walker</u>, 74 F. Supp.2d 287, 301 (W.D.N.Y.
1999) (cases cited therein).

     In his application to the Appellate Division, Petitioner
challenged each of the arguments raised by appellate counsel as
having been weak and attempted to point out the weaknesses
therein.  He failed to explain, however, how any of them had any
merit.

     As I have amply demonstrated, the challenge to the

sufficiency of the evidence had no merit.

Petitioner transformed the issue with respect to alternative counts into an argument that the jury could not have understood the mens rea requirements for the two offenses, apparently because they were not submitted in the alternative.

After explaining the rationale behind depraved indifference and then giving the jury the standard for determining whether an individual's conduct amounted to depraved indifference to human life ("the person's reckless conduct when objectively viewed made it so uncaring, so callous, so dangerous, and so inhuman as to demonstrate an attitude of total and utter disregard for the life of the person endangered" Tr. 1098), the state trial court specified the three elements that had to be found beyond a reasonable doubt to sustain a conviction for depraved indifference murder: Petitioner caused the death of Jennifer Santiago; Petitioner did so by recklessly engaging in conduct which created a grave risk of death to Jennifer Santiago; and Petitioner engaged in the conduct under circumstances which evinced a depraved indifference to human life. With respect to the second degree manslaughter charge, the state trial court told the jury, "[a] person acts recklessly with respect to a death when that person engaged in conduct which creates or contributes to a substantial and unjustifiable risk that another person's death will occur and when he is aware of and consciously disregards that risk and when that risk is of such nature and degree that disregard of it constitutes a gross deviation from

the standard of conduct that a reasonable person would observe in
this situation." Tr. 1100, and then advised the jury of the two
elements necessary to sustain a conviction for the offense:
Petitioner had caused the death of Jennifer Santiago and had done
so recklessly.  In his argument, Petitioner asserts that "grave
risk of death" and "substantial risk of death" are the only
elements which separate the offenses, observes that one person
cannot have two different, and what he apparently thinks are
conflicting, mind sets with respect to the same crime and
concludes that the failure to submit the offenses in the
alternative rendered the jury's verdict meaningless.

As the decision in People v. Suarez, 6 N.Y.3d 202, 811
N.Y.S.2d 267 (2005) (per curiam), amply demonstrates, New York
law maintains a distinction between depraved indifference murder
and reckless manslaughter based on the depravity of the
defendant's act.  The state trial court's charge reflected that
distinction in instructing the jury that the recklessness which
subjected Jennifer Santiago to a grave risk of death had to be of
such a degree that when viewed objectively it sustained depraved
indifference murder whereas Petitioner had to be aware of and
consciously disregard the substantial and unjustifiable risk that
Jennifer Santiago's death would occur to sustain a manslaughter
conviction.  A jury finding that Petitioner was actually aware of
a substantial risk of death and disregarded it does not conflict
with a jury finding that his conduct, from an objective
viewpoint, evidenced a complete lack of regard for whether he

caused the victim's death.

Contrary to Petitioner's assertion, Resp. Exh. Vol. III at 372, counsel attempted to persuade the appellate court that the evidence only justified a manslaughter conviction, and the Appellate Division did not violate any federal constitutional provision by not conducting an explicit analysis of the evidence so as to justify the conviction and its refusal to set aside the verdicts as against the weight of the evidence.

A similar observation applies to appellate counsel's argument that the punishment was too harsh. Whether the Appellate Division exercises its interests of justice jurisdiction to interfere with a conviction or a sentence rests almost entirely within its discretion. N.Y. Crim. Proc. Law §470.15; see People v. Rickert, 58 N.Y.2d 122, 132, 459 N.Y.S.2d 734, 739 (1983). Review of the exercise of that discretion by a higher court(s) is subject to purely discretionary review. Under these circumstances, Petitioner has an almost insurmountable burden to demonstrate that the outcome of the proceeding would have been different.

In addition to characterizing the arguments that were made as weak and poorly drafted, Petitioner also criticized appellate counsel for failing to raise Ground Five on direct appeal, for failing to cite to specific provisions of the United States Constitution and for failing to preserve all of the issues in the leave application to the New York Court of Appeals. As to the first point, the discussion under Ground Five, infra,

demonstrates that the claim has no merit.  As to the second point, Petitioner can never demonstrate that a higher court would have exercised discretionary review and more importantly, to reiterate, preserved or procedurally defaulted, the grounds do not entitle Petitioner to federal habeas relief.[1]

Ground Five (Resp Exh. #31)

Verbatim, from the coram nobis application:  "New York State's Statutory Distinction Between Reckless Manslaughter And Depraved Indifference Murder Violates Defendant's Constitutional Rights to Due Process and Equal Protection of Law As Applied to This Case."  Resp. Exh. Vol. III at 379.  In his §440.10 motion Point I, Resp. Exh. 16, Petitioner raised this claim, and the state trial court ruled that it had been procedurally defaulted because it could have been raised on direct appeal.  Resp. Exh. 22.  In the coram nobis application, Petitioner reiterates the point in the context of claiming that appellate counsel was ineffective for having failed to pursue it.

---

[1]Any issue concerning the procedural defaults occasioned by the leave application could have been resolved by a single additional sentence which asked the New York Court of Appeals to review all of the issues raised in the brief submitted to the Appellate Division.  See Galdamez v. Keane, 394 F.3d 68, 76-77 (2d Cir.), cert. denied sub nom. Galdamez v. Fischer, 544 U.S. 1025 (2005).  Because I have determined that the underlying issues have no merit, I have not considered whether appellate counsel's failure to include that single additional sentence in the application for leave to appeal constitutes ineffective assistance of appellate counsel.  The United States Supreme Court has not yet held that an attorney's failure to insulate issues from the affirmative defense of procedural default on federal habeas review constitutes ineffective assistance of appellate counsel.

According to Petitioner, there is no principled way for a jury to distinguish between the two offenses, given that both involve a recklessness determination, and as a result, that the prosecutor may use depraved indifference to elevate any reckless homicide to murder.

Whatever charges the prosecutor may file, the jury must determine whether the evidence sustains them beyond a reasonable doubt. As the New York Court of Appeals has observed, the Legislature may reasonably conclude that circumstances which evince depraved indifference to human life are not part of the mens rea of the offense, but rather, an aggravating circumstance which justifies enhanced punishment. People v. Cole, 85 N.Y.2d 990, 992, 629 N.Y.S.2d 166, 167 (1995) (mem.). Although criminal juries are asked to determine differences of degree, Petitioner cites and quotes Colautti v. Franklin, 439 U.S. 379, 99 S.Ct. 675, 683 (1979) with respect to the doctrine of void for vagueness: "It is settled that, as a matter of due process, a criminal statute that 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute' or is so indefinite that 'it encourages arbitrary and erratic arrests and convictions,' is void for vagueness." (citations omitted). Accord Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858 (1983). This rule has a corollary applicable to Petitioner's case:

> To succeed, however, the proponent of the vagueness argument "must demonstrate that the law is impermissibly vague in all of its applications." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497, 102

S.Ct. 1186, 1193 (1982). Specifically a challenger "who engages in some conduct that is clearly proscribed [by the challenged statute] cannot complain of the vagueness of the law as applied to the conduct of others." Id. at 495, 102 S.Ct. at 1191; (citations omitted).

United States v. Amer, 110 F.3d 873, 879 (2d Cir.), cert. denied, 522 U.S. 904 (1997). In sum, therefore, he who is guilty of depraved indifference murder cannot complain about vagueness unless he can demonstrate that he is guilty only of manslaughter in the second degree. As Petitioner is guilty of depraved indifference murder, his vagueness challenge has no merit, and therefore appellate counsel cannot be found ineffective for having failed to pursue it.

Ground Six

Although the Petition sets forth grounds numbered 1-7, the sixth states no ground at all. In the sixth ground, Petitioner merely asserts that the decision of the Appellate Division was an unreasonable application of clearly established law as determined by the United States Supreme Court. This assertion merely attempts to restate the §2254(d)(1) statutory threshold for obtaining federal habeas relief on any ground. See Williams v. Taylor, 529 U.S. 362 (2000). It does not constitute a separate ground by itself.

Ground Seven

Petitioner's newly discovered facts and arguments arise entirely from recent decisions of the New York Court of Appeals concerning depraved indifference murder. In light of the record,

27

the Court first turns to a matter of exhaustion of state remedies.

Respondent's counsel reports that although his office has the moving papers, the Orange County Court has advised him that it has no record of a second motion for post conviction relief. The record contains no evidence of a ruling on the second motion. The reason appears to be that upon close inspection, the papers referred to by the State as a second motion were not intended to be a second motion.

After the state filed its opposition to the moving papers, Petitioner sought and was denied an extension of time to file a traverse or reply, actually an amended brief in support of the motion the purpose of which was to present as newly discovered evidence the decision in People v. Sanchez, 98 N.Y.2d 373, 748 N.Y.S.2d 312 (2002). Resp. Exh. Vol. II at 211. The state trial court denied the application for an extension of time by decision dated February 23, 2004 and thereafter the §440.10 application by decision dated February 25, 2004. Resp. Exh. 18-22. Thereafter, Petitioner, obviously unaware of the state trial court's denial of his application, filed a "notice of motion" dated March 2, 2004 to amend what he referred to therein as the "already pending" application. Resp. Exh. Vol II at 207. However, it was no longer pending.

During his incarceration Petitioner has apparently been keeping up with developments in New York law because he has submitted to this Court a document dated February 9, 2006, the

purpose of which is to alert this Court to a New York Law Journal article concerning the decision in People v. Suarez, 6 N.Y.3d 202, 811 N.Y.S.2d 267 (2005) (per curiam).  The latest decision on any area of law from New York's highest court does not constitute newly discovered evidence and does not change this Court's analysis of whether the record contains sufficient evidence unless the highest court of the State somehow changes the elements of the offense.  The decision in Suarez reiterates that the elements which distinguish depraved indifference murder from reckless manslaughter remain what they have always been.

Petitioner can protest that the State cannot cite any case in which facts similar to his have been relied upon to affirm a conviction.  In so doing, it is apparent that his understanding of the facts of this case does not comport with the facts and circumstances which were before the jury.  In his Reply Memorandum in this proceeding Petitioner declares, "The facts in this case are clear the only thing that we, me and Jennifer was trying to do is intensify sexual pleasure.  We did not expect anything to happen or that it would injure Jennifer in anyway." Everything about this, the consumption of beer, the repeated chokings, which had to have stressed Jennifer who had been drinking, the escalation of the conduct to an electrical cord, a situation where she could no longer protest, his experience with women who had been hurt by his choking, his acknowledgement that someone could be killed by a cord wrapped around the throat, his failure to seek help when Jennifer collapsed, his attempt to

cover it up and his spinning the story to the police permitted the jury to conclude beyond a reasonable doubt that killing someone in pursuit of his appetite for the thrill of sexual asphyxia was inevitable, that this case was it and that he did not care if death was the result.

In short, Petitioner has presented nothing in the way of evidence, as opposed to the latest decision(s) from New York's highest court, and therefore, there is nothing for Petitioner to exhaust under this ground. The last decision on the subject from the New York Court of Appeals, Suarez, does not indicate that he is not guilty of depraved indifference murder nor that his case is being treated differently from some other case with similar facts. Petitioner has presented nothing under this ground which entitles him to relief.

Appointment of Counsel

Having had the benefit of the State's opposition papers and apparently believing that the decision in Suarez somehow changed the outcome in his case, Petitioner moved for the appointment of counsel. The standards and considerations applicable to a civil indigent's application for appointment of counsel also apply to a federal habeas petitioner. See, e.g., Frazier v. Wilkinson, 842 F.2d 42, 46-47 (2d Cir.), cert. denied, 488 U.S. 842 (1988); Buitrago v. Scully, 705 F. Supp. 952, 957-958 (S.D.N.Y. 1989).

As evidence of the exercise of their discretion in disposing of applications for pro bono counsel, the Court of Appeals has instructed district courts first, to evaluate the likelihood of

success on the merits of the claim(s).  <u>Ferrelli v. River Manor</u>
<u>Health Care Center</u>, 323 F.3d 196, 203-204 (2d Cir. 2003), <u>cert</u>.
<u>denied</u>, 540 U.S. 1195 (2004); <u>Burgos v. Hopkins</u>, 14 F.3d 787, 789
(2d Cir. 1994); <u>Hodge v. Police Officers</u>, 802 F.2d 58, 61 (2d
Cir. 1986).  "[E]ven though a claim may not be characterized as
frivolous, counsel should not be appointed in a case where the
merits of the indigent's claim are thin and his chances of
prevailing are therefore poor."  <u>Carmona v. U.S. Bureau of</u>
<u>Prisons</u>, 243 F.3d 629, 632 (2d Cir. 2001).  If the application
meets the threshold requirement, the district court should
further consider "plaintiff's ability to obtain representation
independently, and his ability to handle the case without
assistance in the light of the required factual investigation,
the complexity of the legal issues, and the need for expertly
conducted cross-examination to test veracity."  <u>Cooper v. A.</u>
<u>Sargenti Co., Inc.</u>, 877 F.2d 170, 172 (2d Cir. 1989); <u>see</u>
<u>Hendricks v. Coughlin</u>, 114 F.3d 390 (2d Cir. 1997); <u>Terminate</u>
<u>Control Corp. v. Horowitz</u>, 28 F.3d 1335, 1341 (2d Cir. 1994).

Petitioner has not met the threshold requirement.  The
record is adequate to afford meaningful review of his conviction,
which the instant report and recommendation provides.

Based on the foregoing, I respectfully recommend that your
Honor dismiss this Petition for writ of habeas corpus.

<u>NOTICE</u>

Pursuant to 28 U.S.C. §636(b)(l), as amended, and Rule
72(b), Fed.R.Civ.P. the parties shall have ten (10) days, plus an

additional three (3) days, pursuant to Rule 6(e), Fed.R.Civ.P.,
or a total of thirteen (13) working days, (see Rule 6(a),
Fed.R.Civ.P.), from the date hereof, to file written objections
to this Report and Recommendation. Such objections, if any,
shall be filed with the Clerk of the Court, with extra copies
delivered to the chambers of The Honorable Stephen C. Robinson,
at the United States Courthouse, 300 Quarropas Street, White
Plains, New York, 10601, and to the chambers of the undersigned,
at the said Courthouse.

Failure to file timely objections to this Report and
Recommendation will preclude later appellate review of any order
or judgment that will be entered by Judge Robinson. See Thomas
v. Arn, 474 U.S. 140 (1985); Frank v. Johnson, 968 F.2d 298 (2d
Cir.), cert. denied, 506 U.S. 1038 (1992); Small v. Secretary of
H.H.S., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); Wesolek v.
Canadair, Ltd., 838 F.2d 55, 58 (2d Cir. 1988). Requests for
extensions of time to file objections must be made to Judge
Robinson and should not be made to the undersigned.

Dated: June **23**, 2006
White Plains, New York

                              Respectfully submitted,

                              _____
                                   Mark D. Fox
                              UNITED STATES MAGISTRATE JUDGE

        Copies of the foregoing Report and Recommendation have been
sent to the following:

The Honorable Stephen C. Robinson

Mr. Harold H. Mabee, Jr. (00-A-6322)
Southport Correctional Facility
P.O. Box 2000
Institution Road
Pine City, New York 14871

Andrew R. Kass, Esq.
Assistant District Attorney
County Government Center
Goshen, New York 10924